COMMONWEALTH vs. STEPHEN RUPP.[1]

No. 01-P-1194.

Suffolk. January 8, 2003. - February 13, 2003.

Present: DUFFLY, SMITH, & MASON, JJ.

*Constitutional Law,* Search and seizure, Reasonable suspicion. *Search and
Seizure,* Threshold police inquiry, Reasonable suspicion. *Evidence,* Hearsay.
*Practice, Criminal,* Hearsay, Argument by prosecutor. *Firearms.*

Police officers encountering a criminal defendant made no show of authority
before the defendant fled, and the defendant's flight, combined with a
report that the defendant and his companion were engaged in a gun transac-
tion late in the night in a high crime area and the officers' confirmation of
many of the details of that report by their own observations, were enough
to give the police reasonable suspicion to believe not only that the
defendant was in fact participating in a gun sale, but also that the sale was
unlawful. [380-382]

At the trial of an indictment charging the defendant with possession of a
firearm without a license and with receiving a firearm with a defaced
identification number, the judge did not err in admitting in evidence
testimony from a single police officer witness that the police had received
a 911 call involving a firearm, where the testimony was based on the
police officer's own knowledge, the testimony was limited to the facts
required to establish the officer's state of knowledge, and the police action
or knowledge was relevant to an issue in the case; moreover, even if the
admission of the evidence was error, it was harmless, in light of the Com-
monwealth's strong evidence with respect to each of the firearms charges,
and in light of the judge's strong limiting instruction. [382-385]

The prosecutor's closing argument at a criminal trial, although improper, did
not create a substantial risk of a miscarriage of justice, where any prejudice
resulting from the prosecutor's comments, to which the defendant did not
object, was dispelled by the judge's instructions. [385]

This court concluded that the evidence at a criminal trial, viewed in the light
most favorable to the Commonwealth, was sufficient to support the
defendant's convictions of possession of a firearm without a license and of
receiving a firearm with a defaced identification number. [385-386]

INDICTMENT found and returned in the Superior Court Depart-
ment on February 17, 1998.

[1]Also known as Clinton King.

A pretrial motion to suppress evidence was heard by *Charles T. Spurlock,* J., and the case was tried before *Margaret R. Hinkle,* J.

*Chauncey B. Wood* for the defendant.

*Christina E. Miller,* Assistant District Attorney, for the Commonwealth.

MASON, J. On February 17, 1998, a grand jury returned a four-count indictment charging the defendant with possessing a firearm without a license, second offense, G. L. c. 269, § 10(*d*); receiving a firearm with a defaced identification number, G. L. c. 269, § 11C; unlawfully possessing ammunition, G. L. c. 269, § 10(*h*); and possessing marijuana, G. L. c. 94C, § 34.

Prior to trial, the defendant filed a motion to suppress the firearm and other evidence on the ground that, at the time they stopped him, the police did not have reasonable suspicion to believe that he was engaging in criminal activity. A Superior Court judge (motion judge) denied that motion after a hearing.

A jury trial was then held before a different Superior Court judge (trial judge). The jury found the defendant guilty of possession of a firearm and the other charged offenses and, following a separate bench trial, the trial judge found the defendant guilty of the charge of unlawfully possessing a firearm, second offense. The defendant was sentenced to a term of from five years to five years and one day in the State prison on the conviction for possessing a firearm, second offense, and to a concurrent term of two years in a house of correction on the conviction for possessing ammunition. The remaining two convictions were placed on file.

On appeal, the defendant claims that the motion judge erred in failing to suppress the firearm evidence and that the trial judge erred in allowing in evidence certain prejudicial hearsay testimony. He also claims that the prosecutor effectively lowered the Commonwealth's burden of proof during his closing argument and that he was entitled to a required finding of not guilty on each of the firearm counts. We affirm the convictions.

*The suppression hearing.* We summarize the findings of the motion judge, supplemented by uncontroverted testimony of Officer Kenneth Israel and of the other arresting officers, upon

which the judge relied for his ruling.[2] See *Commonwealth* v. *Willis*, 415 Mass. 814, 816-817 (1993); *Commonwealth* v. *Watson*, 430 Mass. 725, 726 n.5 (2000).

On October 21, 1997, at approximately 10:00 P.M., Officer Israel was on patrol in an unmarked police vehicle in the vicinity of Madison Park High School in the Roxbury section of Boston. Two other Boston police officers, David Singletary and Lawrence Celester, were riding with him. Each of the officers was in plain clothes.

At about 10:10 P.M., the officers received a radio report from the police dispatcher that two black males were standing next to a white Nissan Maxima automobile with Massachusetts registration number 8476BG in the rear parking lot of One Terrace Street in Roxbury, and that one was selling a gun to the other. The dispatcher radioed the report in response to a 911 call from a citizen who would not provide his or her name, but stated that he or she had observed the males engaging in the sale.[3]

Officer Israel immediately drove to the Terrace Street address and arrived there about a minute after receiving the dispatch. The buildings at the address are configured around a central parking area and there is a driveway leading into the area. Police officers previously had responded to reports of criminal activity occurring at the address, and it was known to be in a high crime area.

As Officer Israel was driving into the parking area, he and the other officers observed a white Nissan Maxima bearing registration number 8476BG parked with its trunk open. They also observed two black males standing at the rear of the car.

Officer Israel pulled into the parking lot and stopped his car

---

[2]Two other officers participating in the defendant's arrest, David Singletary and Lawrence Celester, also testified at the suppression hearing. An acquaintance of the defendant, Tawana Albert Pringle, testified at the hearing on his behalf.

[3]The tape of the 911 call indicated that the citizen had stated: "Yea, I'm calling . . . there's someone who just bought a gun. They're outside. The license plate of the car is 8476BG, it's a white Maxima. It's a white Nissan Maxima. They just made a . . . gun deal in the car. The address is Terrace Street . . . Seven Terrace Street . . . in the back yard. I saw it, but that['s] all I'm going to leave. I don't want to leave [my name] . . . . It's two actually, black, they're sitting in front of the white Nissan talking in front of 7 Terrace Street . . . the gun is in the car . . . it's a pistol."

between the driveway and the Maxima. He and the other officers got out and began to approach the two males. As they were doing so, one of the males, later identified as the defendant, bolted away after he or the other male had slammed down the trunk of the car. Officers Singletary and Celester immediately ran after the defendant, while Officer Israel apprehended the other male.

During the chase, Officer Celester saw the defendant attempting to throw something from his pocket, and he radioed for back-up help. Officer Singletary continued to run after the defendant and ultimately caught up with him after he had run behind a building on Tremont Street. Officer Singletary immediately pat frisked the defendant for weapons, but found none. At or about this same time, however, another police officer found a loaded nine millimeter handgun with an obliterated serial number on the roof of the building behind which the defendant had run immediately before he was caught. Officer Singletary placed the defendant under arrest and gave him Miranda warnings.

The officers brought the defendant back to the police station for booking. During the booking, a small bag of marijuana was found inside one of the defendant's shoes. Also, while officers were discussing among themselves that a gun had been found at the scene, the defendant stated to the officers that "I wasn't trying to sell the gun."

1. *Suppression issues.* In denying the defendant's suppression motion, the motion judge reasoned that the police had not seized the defendant until after he had begun his flight and that, at that time, the police had a reasonable suspicion that the defendant had committed or was committing a crime. See *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974); *Commonwealth* v. *Willis*, 415 Mass. 814, 817 (1993). The judge found specifically that, prior to the defendant's flight, "there was no police show of authority . . . which might convert an investigative encounter into a freedom restricting seizure."

The defendant contends that, for constitutional purposes, he was in fact seized before he had begun his flight because there was evidence that Officer Israel had stopped his car in such a way as to effectively block the Maxima from leaving the park-

ing lot and, further, that Officer Israel had pulled out his gun and said, "Don't move" as he was getting out of the car. The defendant further contends that, even if the police had not seized him before he began his flight, they still did not have reasonable suspicion after he had begun his flight that he had engaged or was engaging in criminal activity.

" 'In reviewing the denial of a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error.' *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), and cases cited. A judge's legal conclusion, however, 'is a matter for review . . . particularly where the conclusion is of constitutional dimensions. *Commonwealth* v. *Jones*, 375 Mass. 349, 354 (1978).' " *Commonwealth* v. *Evans*, 436 Mass. 369, 372 (2002).

While Officer Israel testified at the suppression hearing that he had stopped his car between the Maxima and the driveway leading into the parking lot, he also stated that he had stopped his car about twenty feet from the Maxima. He did not testify that he had even attempted to place his car in such a location as to prevent the Maxima from leaving the parking area, let alone come close to doing so. Contrast *Commonwealth* v. *Bottari*, 395 Mass. 777, 779 (1985); *Commonwealth* v. *Sanderson*, 398 Mass. 761, 766 (1986).

Moreover, the only evidence at the suppression hearing that Officer Israel had drawn his gun and ordered the defendant and his companion not to move prior to the defendant's flight was the testimony of a citizen, Tawana Albert Pringle, who, at the time, was living with the defendant's companion in an apartment near where the incident occurred and who claimed she was present during the incident. The judge was not required to and did not credit this testimony, which was explicitly contradicted by the testimony of Officer Israel, who stated that the defendant began fleeing "spontaneously" at the time the officer was getting out of the car and before he had pulled out his gun or said anything. See *Commonwealth* v. *Meehan*, 377 Mass. 552, 557 (1979), cert. dismissed, 445 U.S. 39 (1980).

In view of the testimony of Officer Israel and the other officers at the suppression hearing, we can discern no "clear error" in the motion judge's factual finding that the police had made no show of authority before the defendant commenced his flight.

We further agree with his conclusion that the police had not otherwise stopped or seized the defendant before he commenced his flight. See *Commonwealth* v. *Rock*, 429 Mass. 609, 611-612 (1999). See also *Commonwealth* v. *Pimentel*, 27 Mass. App. Ct. 557, 561 (1989) (presence of three officers not overwhelming).

We likewise reject the defendant's claim that, even after he began his flight, the police did not have reasonable suspicion to believe that he was engaging in criminal activity. While flight from the police is not alone enough to justify a reasonable suspicion, it may be considered with other factors. See *Commonwealth* v. *Fisher*, 54 Mass. App. Ct. 41, 44 (2002), and cases cited. Here, the police had received a report from a citizen that the defendant and his companion were engaged in a gun transaction late in the evening in a high crime area and had confirmed with their own observations many of the details the citizen had provided. When combined with the defendant's precipitous flight at the first sighting of the police, these circumstances were enough to give the police reasonable suspicion to believe not only that the defendant was in fact participating in a gun sale as the citizen had reported, but also that the sale was unlawful. See *Commonwealth* v. *Wilson*, 52 Mass. App. Ct. 411, 414-415 (2001), and cases cited.

The defendant's reliance on *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62 (1997), is misplaced. In that case, the police had received an anonymous tip that a group of youths congregating in a public recreational facility on a summer evening had a gun, but no information as to which member of the group allegedly had the gun. *Id.* at 63. Subsequently, when police officers approached the youths, the group broke up, and some of the youths began walking away, but none of them started running. *Ibid.* Here, by contrast, the informant's tip concerned only two individuals involved in a gun sale and, when the police approached the two individuals, the defendant engaged in headlong flight before the police had said anything. In these circumstances, unlike in *Grinkley*, the police had reasonable suspicion to seize and frisk the defendant. See *Commonwealth* v. *Mercado*, 422 Mass. 367, 371 (1996). See also *Illinois* v. *Wardlow*, 528 U.S. 119, 124-125 (2000).

2. *Admission of hearsay evidence.* Prior to trial, the defendant

filed a motion in limine to prevent any reference at trial to the substance of any 911 calls or radio dispatches. The trial judge allowed the motion without prejudice, stating that she would consider allowing the prosecutor to elicit a bland or neutral description of the nature of the call, but not any information that the person making the call had observed the sale of a gun.

Subsequently, during the trial, the trial judge agreed, over the defendant's objection, that the prosecutor could elicit from a single witness that the police had received a 911 call "involving a firearm." The prosecutor thereafter elicited the following testimony from Officer Celester:

Q. "While you were on routine patrol, officer, did you receive a radio transmission?"

A. "Yes, we did."

Q. "Did that radio transmission involve a 911 call?"

A. "Yes, it did."

Q. "What was the nature of that 911 call?"

A. "Regarding a firearm."

While the Supreme Judicial Court has permitted the use of such testimony to explain the reasons for police action, it has also noted that such testimony "carries a high probability of misuse, because a witness may relate 'historical aspects of the case, replete with hearsay statements in the form of complaints and reports,' even when not necessary to show [the] state of police knowledge." *Commonwealth* v. *Rosario*, 430 Mass. 505, 509 (1999), quoting from McCormick, Evidence § 249, at 734 (E. Cleary ed. 1984). Accordingly, the court has held that such testimony is admissible only if it is based on the police officer's own knowledge, it is limited to the facts required to establish the officer's state of knowledge, and the police action or knowledge is relevant to an issue in the case. *Commonwealth* v. *Rosario*, *supra* at 509-510.

Each of these criteria was met in this case. Officer Celester had personal knowledge of the dispatch relaying the 911 call and that this was the reason the police had proceeded to the

Terrace Street address.[4] His testimony was also carefully limited to the general subject of the call and did not disclose any details. Finally, the evidence was relevant and necessary to explain both why the police had arrived at the Terrace Street address and also why they acted as they had when they got there in the absence of any apparent threat from the defendant or his companion. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 393 (1992) (noting that investigating officer should be allowed "some explanation of his presence and conduct"). Contrast *Commonwealth* v. *Valentin*, 55 Mass. App. Ct. 667, 673-674 (2002).

Even if admission of Officer Celester's testimony was error, it was harmless in this case. The Commonwealth's evidence with respect to each of the firearms charges was strong and included not only the defendant's precipitous flight, but also the subsequent discovery of the handgun on a roof of a building within tossing range of where the defendant had stopped. While the prosecutor referred to Officer Celester's testimony during his closing argument, it was not to prove its truth, but only to explain why the police were searching for a gun.[5] Contrast *Commonwealth* v. *Randall*, 50 Mass. App. Ct. 26, 28 (2000). Finally, the defendant requested and the trial judge gave a strong limiting instruction directing the jury that they could not consider the evidence pertaining to the 911 call for the truth of any statement attributed to the person who had made the call:

> "Now, ladies and gentlemen, in this case during the trial, you have heard some testimony about the nature of a 911 call made to police officers. I instruct you that that testimony may not be used for the truth of the statement attributed to the 911 caller, because that would be hearsay. Rather, I admitted that evidence only for a limited purpose,

---

[4]We reject the defendant's contention that Officer Celester needed to have personal knowledge of the 911 call itself. There is nothing in the court's decision in *Rosario* that goes this far.

[5]Specifically, the prosecutor argued: "First of all, why was there even a search for the firearm? Well, when the officers were in their car, they had a 911 call to respond to a specific location for a report of an incident involving a firearm, so there's state of mind. The officer's state of mind was, I'm responding to an incident involving a firearm."

that is as a basis for the presence and the conduct of the police officers in the area which they were describing."

Given the circumstances described above, this instruction was sufficient to avert any prejudice to the defendant from admission of Officer Celester's testimony regarding the 911 call. See *Commonwealth* v. *Jackson*, 384 Mass. 572, 579 (1981); *Commonwealth* v. *Helfant*, 398 Mass. 214, 228-229 (1986) (court presumes jury follows judge's instructions).

3. *Prosecutor's closing argument.* During his closing argument, the prosecutor, in urging that the jury could rely on circumstantial evidence in returning their verdicts, stated, "[E]very day of your lives, believe it or not, you use circumstantial evidence and draw inferences. You draw conclusions that you believe to be proof beyond a reasonable doubt." The prosecutor then went on to provide an example: the jurors might conclude beyond a reasonable doubt that it had been raining by observing puddles all over the pavement after they had been inside all day.

The defendant claims that this argument was improper because it effectively lowered the Commonwealth's burden of proof. We agree that the prosecutor's comments tended to trivialize the concept of reasonable doubt and, hence, were improper. See *Commonwealth* v. *Ferreira*, 373 Mass. 116, 129 (1977). Nevertheless, the trial judge instructed the jury just prior to closing arguments that the content of the arguments was not to be considered evidence. In addition, at the beginning of her charge the trial judge informed the jury of their duty to accept the law as she instructed them and to apply it to the facts they found. Finally, the judge gave a full and correct definition of reasonable doubt in her charge to the jury. In these circumstances, we conclude that any prejudice resulting from the prosecutor's comments, which were not objected to, was dispelled by the judge's instructions and did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Atkins*, 386 Mass. 593, 602 (1982); *Commonwealth* v. *Cook*, 419 Mass. 192, 203-204 (1994). See also *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 (1987).

4. *Sufficiency of the evidence.* The Commonwealth called as witnesses at trial each of the officers who testified at the sup-

pression hearing, and also James Rattigan, the officer who found the gun on the roof of the building behind which the defendant had run just before he was caught. It also called as an expert witness Officer Mark Vickers of the Boston police department, who testified that the serial number of the gun had been destroyed and appeared to have been scratched out and, further, that there were abrasions on the bottom corner of the handle and also on the front muzzle of the gun which were consistent with the gun having struck a hard surface, such as concrete.

Viewed in the light most favorable to the Commonwealth, see, e.g., *Commonwealth* v. *Harris*, 47 Mass. App. Ct. 481, 489 (1999), the evidence showed that the defendant had fled from the scene as soon as the police had arrived, that he had attempted to discard something from his pocket as he ran, that he ultimately ran behind a twelve-foot high building and crouched down in a grassy area, and that a loaded gun was subsequently found on the roof of that building. The Commonwealth's evidence also showed that, after he was taken to the police station, the defendant spontaneously exclaimed, "I wasn't trying to sell the gun." The defendant's motion for a required finding of not guilty on the firearms charges was properly denied. See, e.g., *Commonwealth* v. *Gilbert*, 423 Mass. 863, 868 (1996); *Commonwealth* v. *Andrews*, 427 Mass. 434, 440 (1998).

*Judgments affirmed.*